STATE OF CONNECTICUT *v.* LONNIE McLUCAS

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, Js.

Argued December 10, 1976—decision released March 15, 1977

*Michael P. Koskoff,* with whom were *Lucy V. Katz* and, on the brief, *Theodore I. Koskoff* and *John D. Jessep,* for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

BARBER, J. The defendant was charged with the following violations of the General Statutes (Rev. to 1968): by indictment with the crime of kidnapping resulting in death in violation of General Statutes § 53-27, and by information with the crimes of conspiracy to commit kidnapping in violation of § 53-27, conspiracy to commit murder in violation of § 54-197, and with the crime of binding with intent to commit crime in violation of § 53-19. A jury found the defendant guilty of conspiracy to commit the crime of murder and not guilty of the other crimes. The defendant has appealed from the judgment rendered, assigning as error a number of rulings by the trial court.

A brief statement of some of the background facts, not disputed by the parties, will put the issues in proper perspective. The charges against the defendant, Lonnie McLucas, all arose out of events culminating in the death of Alex Rackley. The defendant and others had established a branch of the Black Panther Party in New Haven. The conspiracy to murder Rackley was alleged to have developed during the period of May 18 through May 21, 1969, and was alleged to have included several members and affiliates of the Black Panther Party in New Haven. Those charged included the national party chairman, Bobby Seale, who was indicted for participation in the murder and was alleged to have given the order that Rackley be killed. The state contended that Rackley was tortured and killed because he was suspected of being a police informer. A number of those charged with being involved in the murder entered guilty pleas. Two pleaded guilty to second degree murder, two pleaded guilty to conspiracy to commit murder, three pleaded guilty to aggravated assault, and one

pleaded guilty to conspiracy to commit kidnapping. All charges against Bobby Seale were dismissed after a lengthy trial ended in a hung jury. The defendant was tried alone after being denied a joint trial with several other defendants. It is undisputed that Rackley was "disciplined" by torture and then was bound and driven to a swamp in Middlefield. During the trial, the defendant described his participation in the events and admitted that after Rackley had been taken to a wooded area and had been shot once, he, McLucas, was given the gun and fired a second shot. The defendant's defense for his actions was predicated on the claim of an overwhelming fear of, and coercion by, another alleged participant, George Sams, whom the defendant sought to portray as a madman. The state contended that Rackley was tortured and killed not because of pressure from one individual, Sams, but because he was suspected of being a police informer within the Black Panther Party.

The court made a finding on each of the rulings involved in this appeal, which finding includes such facts as were considered incidental to each of the respective rulings.

I

Prior to the trial, the defendant moved to suppress as evidence a tape recorder, tape recordings and a .45-caliber pistol which had been seized from an apartment at 365 Orchard Street in New Haven. The motion was denied without prejudice to the defendant's right to renew it at the time of trial. There was subsequently a full hearing on the motion at the time of trial. The defendant claimed that he had standing to challenge the search on the basis of his membership on the central staff

of the Black Panther Party. The court concluded that the defendant did not have standing to challenge the search and seizure in that he was not on the premises at the time of the seizure and had no possessory interest in either the premises or the articles seized. "[T]here is no standing to contest a search and seizure where . . . the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." *Brown* v. *United States,* 411 U.S. 223, 229, 93 S. Ct. 1565, 36 L. Ed. 2d 208. A person may have a possessory interest in the premises searched even though he has no title to the premises. *Mancusi* v. *DeForte,* 392 U.S. 364, 367–68, 88 S. Ct. 2120, 20 L. Ed. 2d 1154; *Jones* v. *United States,* 362 U.S. 257, 265, 80 S. Ct. 725, 4 L. Ed. 2d 697; *State* v. *Darwin,* 161 Conn. 413, 419, 288 A.2d 422. The defendant had the burden of establishing the facts necessary to demonstrate a basis for standing to attack the search and seizure. See *Combs* v. *United States,* 408 U.S. 224, 227, 92 S. Ct. 2284, 33 L. Ed. 2d 308. It has been made clear that capacity to claim the protection of the fourth amendment depends not upon a property right in the premises searched but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion. *Mancusi* v. *DeForte,* supra, 368; *Katz* v. *United States,* 389 U.S. 347, 352, 88 S. Ct. 507, 19 L. Ed. 2d 576. It is evident that the defendant was not charged with an offense that had as an essential element the possession of seized evidence at the

time of the search and seizure. See *Brown* v. *United States,* supra. In addition, it appears from the finding that the defendant was not at the apartment when the police entered and the seizure occurred, and the articles neither belonged to the defendant nor were they in his custody at the time they were seized.

In this case, the critical issue on the defendant's motion to suppress as evidence the property seized is whether, in light of all the circumstances, the defendant had a possessory interest in the searched premises at 365 Orchard Street such that those premises constituted an area in which the defendant had a "reasonable expectation of freedom from governmental intrusion." *Mancusi* v. *DeForte,* supra. In *Mancusi,* the defendant union official was found to have standing to object to the seizure of certain union records. The papers were taken from an office which was used for union purposes and which the defendant shared with several other union officials. It was stipulated that he spent a considerable amount of time in that office, and that he had custody of the papers at the moment of their seizure. He was present in the office during the seizure, and protested the taking of the papers. In marked contrast, it appears from the finding in the present case that Warren Kimbro was the person who resided in, and paid the rent for, the apartment at 365 Orchard Street; that the defendant did not live in this apartment, had no proprietary interest in it, and had only stayed overnight there once; that the defendant had no possessory interest in the articles seized; that the Black Panther group in New Haven held meetings at Warren Kimbro's apartment; and that the apartment was mainly a residence and only sometimes used for office pur-

poses by the Black Panther group. In further contrast to the situation in *Mancusi,* in the present case there was no stipulation or finding that the defendant had custody of the items at the moment of seizure. The defendant's reliance on *State* v. *Darwin,* 161 Conn. 413, 288 A.2d 422, is also misplaced. In that case, we held (p. 420) that a husband had standing to challenge a search and seizure involving his wife's automobile because "[t]o hold . . . that a vehicle titularly owned by a wife is not also owned by the husband for purposes of search and seizure would seem to be an improper stretching of technicalities." Such a situation is clearly distinguishable from the remote connection which the defendant had with the premises in question here. The conclusions of the trial court set forth in the finding must stand if they are legally and logically consistent with the subordinate facts found unless they involve the application of some erroneous rule of law material to the case. *State* v. *Bowen,* 167 Conn. 526, 531, 356 A.2d 162; *Consiglio* v. *Warden,* 160 Conn. 151, 157, 276 A.2d 773. We have examined the subordinate facts in the finding relating to this issue and are of the opinion both that they support the conclusions reached and that those conclusions involve no erroneous rule of law.

## II

The defendant moved to suppress statements made by him to officers in Salt Lake City, Utah, before voluntarily returning to this state, and a statement made by him to Sergeant Vincent J. DeRosa in New Haven on June 11, 1969. There was a full hearing on the motion to suppress statements at the time of trial. A detailed recital of all the facts contained in the voluminous finding would unduly lengthen this opinion, but we do include the fol-

lowing summary of the facts found by the court: On June 6, 1969, the Salt Lake City office of the Federal Bureau of Investigation (hereinafter referred to as the F.B.I.) had received a call from the F.B.I.'s New York office that two individuals for whom the New York office had fugitive warrants would possibly stop at the Western Union office in Salt Lake City. The bureau had a fugitive warrant for the defendant who arrived at the Western Union office on June 6, 1969. The defendant was taken into custody and advised of his rights. At the F.B.I. office in Salt Lake City, he was charged with unlawful flight to avoid prosecution and was informed of the Connecticut warrant charging him with conspiracy, murder, kidnapping and other crimes. The defendant signed a formal, written statement of his rights, which statement included a waiver of his right to an attorney. It was explained to the defendant that he did not have to sign the form. Thereafter, Lynn G. Twede, an agent for the F.B.I., interviewed the defendant briefly before he was taken to be presented before a United States commissioner. The defendant indicated to Twede that he (the defendant) knew who had killed Alex Rackley and that he could produce witnesses, but he wanted assurances that he would not have to testify.

Sergeant DeRosa first saw the defendant in Salt Lake City on June 8, 1969. At that time the defendant signed a form containing the "Miranda" warnings and indicated that he understood them. At the time, and in the presence of Sergeants DeRosa and Nicholas Pastore of the New Haven police department, and two agents of the F.B.I., the defendant further indicated that he would be willing to talk about the investigation of the case. It does not

appear what conversation subsequently took place on June 8, 1969. On June 9, 1969, the defendant was at the Salt Lake County courthouse with a lawyer. Sergeant DeRosa had not known on the previous day that an attorney had been appointed for the defendant. After conferring with his attorney, the defendant waived extradition and left Salt Lake City by airplane on June 10, 1969, with Sergeants DeRosa and Pastore. It does not appear what statements relative to the case under investigation were made by the defendant during the course of the plane trip. Sergeant DeRosa did show the defendant photographs of some of the people involved in the investigation and disclosed parts of statements which had been taken from others and which might tend to incriminate him. The defendant was arraigned in the Superior Court in New Haven on June 11, 1969. The clerk of the court informed the defendant of his rights but did not tell the defendant that if he could not afford an attorney one would be appointed for him. After the defendant was arraigned on June 11, 1969, he was given two warnings of his constitutional rights. The second warning forms a part of a statement that was reduced to typewritten form.

The defendant waived extradition, entered this state voluntarily, and was put to plea in this case. No question was raised as to the defendant's arrest in Salt Lake City prior to voluntarily returning to this jurisdiction, and none was ever made to the trial court. The defendant, however, issued subpoenas to the F.B.I., seeking information on the legality of his arrest, when the motion for suppression was being heard. Those subpoenas were quashed on motion of the assistant United States attorney.

The court concluded that the defendant in all stages of the proceeding on June 11, 1969, had his constitutional rights explained to him and that he voluntarily, knowingly and intelligently waived those rights. The court further concluded that the tape of the defendant's interview on June 11, 1969, and the taped statement of such interview were voluntarily given and should be admitted as evidence, and that the motion to quash the subpoenas, which was made by the United States, should be granted on the basis of 5 U.S.C. § 552 (b) (7).

In attacking the admission of statements made to officers in Salt Lake City, the defendant contends that such statements made by him while in custody should have been suppressed because an attorney had been appointed to represent him by a United States commissioner. The difficulties with the defendant's argument are that he does not particularize what statements are involved and he misplaces his reliance on the case of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. The *Miranda* case holds that no effective waiver of right to counsel during interrogation can be recognized unless specifically made after the person interrogated has been apprised of his rights by being given the "Miranda" warnings. Despite the defendant's assertion, it does not hold that "[o]nce a criminal defendant is represented by counsel, he cannot waive any of his so-called 'Miranda' rights without his attorney's aid and advice." See *United States* v. *Hall,* 523 F.2d 665, 668 n.4 (2d Cir.); *United States* v. *Diggs,* 497 F.2d 391, 393 (2d Cir.); *Moore* v. *Wolff,* 495 F.2d 35, 36–37 (8th Cir.); *United States* v. *Cobbs,* 481 F.2d 196, 199 (3d Cir.); *United States* v. *Barone,* 467 F.2d 247, 249 (2d Cir.). As stated in *Moore* v. *Wolff,* supra, 37: "If an

accused can voluntarily, knowingly, and intelligently waive his right to counsel before one has been appointed, there seems no compelling reason to hold that he may not voluntarily, knowingly, and intelligently waive his right to have counsel present at an interrogation after counsel has been appointed. Of course, the Government will have a heavy burden to show that the waiver was knowingly and intelligently made, *Miranda* v. *Arizona*, . . . [384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694] but we perceive no compelling reason to adopt the per se rule advocated by petitioner." In similar circumstances, the court held that "[s]ince there was no coercion or deception and . . . [the defendant] waived his right to counsel, the [F.B.I.] agents were not required, before taking his voluntary statement, to seek out the attorney who had been appointed." *United States* v. *Hall,* supra. This is not a case where the defendant waived his right to counsel without full knowledge of the crimes of which he was suspected. See *United States* v. *Diggs,* supra, 393 n.3. There is no showing that the defendant ever requested that an attorney be present or indicated a desire to remain silent. See *State* v. *Moscone,* 171 Conn. 500, 370 A.2d 1030. In the present case the facts establish beyond any doubt that the state's burden was discharged and that the defendant's waiver was voluntarily, knowingly and intelligently made.

In attacking the admission of the statement made to Sergeant DeRosa in New Haven on June 11, 1969, the defendant contends that it was tainted by a possible illegal arrest of the defendant by the F.B.I. in Salt Lake City. The defendant suspected that his arrest might have been aided by the use of illegal electronic surveillance. The defendant argues that in the case of an illegal arrest the statement

given by him on June 11, 1969, was the "fruit of the poisonous tree" and should have been suppressed. See *Wong Sun* v. *United States,* 371 U.S. 471, 487–88, 83 S. Ct. 407, 9 L. Ed. 2d 441. In attempting to pursue his suspicion that electronic eavesdropping had been involved in his arrest, the defendant issued two subpoenas directed to several F.B.I. agents, seeking to compel them to appear and bring certain electronic surveillance documents. The first subpoena sought information as to whether the F.B.I. had received information regarding the defendant's presence in Salt Lake City through electronic surveillance or wiretapping of the Jersey City Black Panther office or from an informant or from disclosure by Western Union. The second subpoena had to do with wiretapping devices, if any, of Warren Kimbro's apartment at 365 Orchard Street, New Haven, although the defendant did not claim that there were any wiretapping devices there. The court granted the motion to quash of the assistant United States attorney on the basis of 5 U.S.C. § 552 (b) (7). At the time of trial, 5 U.S.C. § 552 established the guidelines for public access to information held by a federal agency, while 5 U.S.C. § 552 (b) (7) exempted from the general disclosure requirements "investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency." In his brief, the defendant apparently seeks to come within the exception of 5 U.S.C. § 552 (b) (7) for disclosure of matter "available by law to a party" by his discussion of 18 U.S.C. § 2518 (8) (d), which provides for notice of electronic surveillance to "persons named in the [wiretap] order or the application, and such other parties to intercepted communications as the judge may determine." The defendant did

not actually claim that there were any wiretapping devices at Warren Kimbro's apartment, and the rest of his allegations are equally speculative. Federal wiretapping legislation at the time of trial provided that an "aggrieved person" could move to suppress "the contents of any intercepted wire or oral communication, or evidence derived therefrom" on the ground of its unlawful interception; 18 U.S.C. § 2518 (10) (a); and defined such an aggrieved person as one "who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U.S.C. § 2510 (11). In assessing claims of suspected illegal electronic surveillance, courts have looked for a relatively precise showing of the facts which reasonably have led a person to believe he has been subjected to undisclosed electronic surveillance, and have disapproved of speculative claims which lack sufficient precision and substantiation. See, e.g., *United States* v. *See,* 505 F.2d 845, 856 (5th Cir.), affidavits vague and conclusory to the point of being a fishing expedition; *United States* v. *Alter,* 482 F.2d 1016, 1026 (9th Cir.); *Cohen* v. *United States,* 378 F.2d 751, 761 (9th Cir.); *People* v. *Cruz,* 34 N.Y.2d 362, 314 N.E.2d 39. The defendant's contention that he would be a party entitled by law to access to the F.B.I.'s investigative material and wiretap data because 18 U.S.C. § 2518 (8) (d) "mandates eventual wiretap notice" appears rather tenuous.[1]

The defendant also argues that he was denied his sixth amendment right to have compulsory process for obtaining witnesses in his favor by the

---

[1] See *State* v. *DeMartin,* 171 Conn. 524, 534, 370 A.2d 1038, which contains a detailed history and discussion of present federal and state statutes relating to electronic surveillance.

fact that F.B.I. agent Twede testified for the state while the defendant was prevented, by the quashing of his subpoenas, from compelling certain other F.B.I. agents to appear and bring electronic surveillance documents. The defendant relies entirely on *Washington* v. *Texas,* 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019, for his contention that the sixth amendment mandated that he have access to the alleged wiretap information under these circumstances. In *Washington* v. *Texas,* supra, the United States Supreme Court (p. 22) found that the federal constitution was violated by two Texas statutes which allowed a participant in a crime to testify for the prosecution but not for a defendant coparticipant and thereby established "arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of a priori categories that presume them unworthy of belief." Such a situation is certainly distinguishable from the facts of the present case. The defendant was nowhere deliberately prevented from presenting his version of the facts. There was no statute or rule making the testimony of F.B.I. agents available to, and competent evidence for, the state but not for the defendant. The quashing of the defendant's subpoenas had to do with the conjectural nature of his claims rather than with any discriminatory and arbitrary statutory scheme.

The issue of whether the court erred in quashing the subpoenas would not be dispositive of whether the defendant's statement to Sergeant DeRosa was admissible. This is because even were we to assume[2] the illegality of the defendant's arrest in

---

[2] This assumption, however, appears remote in light of the recent decision in *United States* v. *Donovan,* 429 U.S. 413, 97 S. Ct. 658, 50 L. Ed. 2d 652.

Salt Lake City this would not end our inquiry under the "poisonous tree" doctrine of *Wong Sun* v. *United States,* 371 U.S. 471, 487–88, 83 S. Ct. 407, 9 L. Ed. 2d 441. In his brief the defendant has relied heavily on the wiretap question and his inability to probe the legality of his original arrest. Under the facts of this case, however, the central and dispositive issue is, rather, the voluntariness of the defendant's statement and whether such voluntariness is sufficient to sever any causal relationship between any prior illegality and the statement. "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation omitted.]" *Wong Sun* v. *United States,* supra. The question of whether a statement is sufficiently voluntary under *Wong Sun* to be deemed independent of any prior illegality must be resolved upon the facts of each case. No single fact is dispositive, and the burden of showing the admissibility of the statement rests upon the state. *Brown* v. *Illinois,* 422 U.S. 590, 603–604, 95 S. Ct. 2254, 45 L. Ed. 2d 416. The *Miranda* warnings are an important factor in determining the voluntariness of the statement, and other relevant factors are the temporal proximity of the arrest and the statement, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct. Ibid. In the present case, the claimed illegality is that an illegal search (a wiretap) occurred in which information was

obtained as to the location of the defendant for whom the authorities already had a valid arrest warrant. Days and not two hours as in *Brown* v. *Illinois, supra,* separated the initial arrest on June 6, 1969, Sergeant DeRosa's first meeting with the defendant on June 8, 1969, and the defendant's statement to DeRosa on June 11, 1969, which was the object of the motion to suppress. The defendant had repeatedly been given his *Miranda* warnings and had indicated that he understood them and still wished to waive his rights. It appears from the finding that it was the defendant who sought to initiate a bargaining process by indicating that he had information regarding Rackley's murder but wanted assurances that he would not have to testify. See *United States* v. *Mullens,* 536 F.2d 997, 1000 (2d Cir.). The defendant was fully aware of the charges facing him, and there is no intimation that the defendant did not fully understand the consequences of his actions. Ibid. As the United States Supreme Court has recently emphasized, in finding that a defendant's consent to a police search of his automobile was voluntary, "[t]here is no indication in this record that [the defendant] was a newcomer to the law, mentally deficient, or unable in the face of custodial arrest to exercise a free choice." *United States* v. *Watson,* 423 U.S. 411, 424–25, 96 S. Ct. 820, 46 L. Ed. 2d 598. There is no indication in the finding that any promises were made or that there were "more subtle forms of coercion that might flaw his judgment." Id., 424. The fact of custody alone "has never been enough in itself to demonstrate a coerced confession or consent to search." Ibid. Although *United States* v. *Watson, supra,* involved a legal arrest and, therefore, a lesser burden of proof on the state because there was no taint of

illegality to purge; see *State* v. *Traub,* 151 Conn. 246, 249, 196 A.2d 755, cert. denied, 377 U.S. 960, 84 S. Ct. 1637, 12 L. Ed. 2d 503; the same factors are relevant in determining the voluntariness of the defendant's statement in the present case. Above all, there was no suggestion whatsoever in this case that "[t]he illegality . . . had a quality of purposefulness. The impropriety of the arrest was obvious . . . . The manner in which [the] arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." *Brown* v. *Illinois,* supra, 605. Nor was any police overreaching or overt act or threat of force proved or claimed. See *United States* v. *Watson,* supra, 424; *United States* v. *Mullens,* supra. In short, there was ample evidence on which the court could base its conclusion that the defendant's statement was completely voluntary, "an act of free will unaffected by the initial illegality." *Brown* v. *Illinois,* supra; see *State* v. *Traub,* supra. The court therefore did not err in admitting the defendant's statement to Sergeant DeRosa.

### III

Prior to the trial the state moved to sever the trial of the defendant from that of others alleged to be involved in the death of Alex Rackley. Over the defendant's opposition the court granted the state's motion. Subsequently, the defendant moved that he be tried after the other defendants or, in the alternative, together with the others, and, finally, that immunity be granted to certain witnesses. Those motions were denied. The defendant assigns as error the action of the trial court on those motions. The defendant argues (1) that he had a right to be tried together with the others, (2) that

he could waive the right to be tried separately, and (3) that the court should have granted his request for immunity of the witnesses facing charges arising out of the same subject matter.

Ordinarily it is the defendant who moves for a separate trial and when he does so the determination of the motion is within the discretion of the court. *State* v. *Holup,* 167 Conn. 240, 244, 355 A.2d 119; *State* v. *Klein,* 97 Conn. 321, 324, 116 A. 596. "[C]ases arise where the defenses of the different parties are antagonistic, or where evidence will be introduced against one which will not be admissible against others. Where from the nature of the case it appears that a joint trial will probably be prejudicial to the rights of one or more of the parties, a separate trial should be granted when properly requested." *State* v. *Brauneis,* 84 Conn. 222, 226, 79 A. 70. A motion for a separate trial can be determined only on the basis of whether at the time "it appears that a joint trial will probably result in substantial injustice." *State* v. *Castelli,* 92 Conn. 58, 63, 101 A. 476; *State* v. *Holup,* supra, 245. A similar test should be applied when the prosecutor makes the motion for a separate trial. See ABA, Standards Relating to Joinder and Severance (1968) § 2.3 (b). At the time of trial our rules of practice permitted joinder of defendants, subject to the power of the court to order separate trials. Practice Book § 532.[3]

The state based its motion on (1) the fact that it had a statement from the defendant and that the

---

[3] Our new rules of criminal procedure (effective October 1, 1976) provide that each defendant shall be charged in a separate indictment or information; Practice Book § 2036; and that upon order two or more indictments or informations against different defendants may be tried together. Practice Book § 2240.

statement could not be used in a trial involving several defendants together because of the rule enunciated in *Bruton* v. *United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476; (2) the defendant had been informed against individually by indictment and substituted information; and (3) the defendant was not on the Orchard Street premises at the time that the arrests and searches incident to said arrests were made there and that, therefore, he would have a different status from the others insofar as standing regarding a motion to suppress was concerned.

The *Bruton* case holds that the introduction into evidence in a joint trial of a confession implicating the defendant and made by a codefendant who does not testify is improper and cannot be cured by jury instructions. See *State* v. *Hunt,* 154 Conn. 517, 227 A.2d 69, vacated and remanded, 392 U.S. 304, 88 S. Ct. 2063, 20 L. Ed. 2d 1110, for further consideration in the light of *Bruton* v. *United States,* supra, and *Roberts* v. *Russell,* 392 U.S. 293, 88 S. Ct. 1921, 20 L. Ed. 2d 1100. The defendant argues that he did testify at the trial and at all times intended to do so. The short answer to this argument is that at the time the motion was heard there was no sure way of knowing whether the defendant would take the witness stand and expose himself to cross-examination. Under the circumstances the court did not abuse its discretion in granting a separate trial on the ground that the defendant had made a confession incriminating other codefendants. *State* v. *Klein,* supra, 324; see *State* v. *Castelli,* supra. It is unnecessary to consider the further grounds for a separate trial except to note that they had a tendency to bolster the state's first ground for a separate trial.

The defendant asserts that the right to be tried separately from one's codefendants is a right which belongs to an accused and can be waived. Of course there is no constitutional or absolute right to a separate trial. 5 Wharton, Criminal Law and Procedure (Anderson) §§ 1943, 1944; see annot., 59 A.L.R.2d 841. Assuming the ability of an accused in a proper case to waive a right to a separate trial, that right does not necessarily carry with it the right to insist upon the opposite of that right, in this case a joint trial. See *Singer* v. *United States,* 380 U.S. 24, 34–35, 85 S. Ct. 783, 13 L. Ed. 2d 630.

The defendant further contends that once the court had granted the motion for a separate trial, it should have granted the defendant's requests for immunity of witnesses facing charges arising out of the same subject matter. We have recently considered the issue of immunity and have held that there is no authority for a court in this state to grant immunity to an accused's witnesses, and General Statutes § 54-47a does not apply. *State* v. *Simms,* 170 Conn. 206, 210–11, 365 A.2d 821. As in *Simms,* the defendant in this case has failed to cite any case that supports his claim. We find no merit to the defendant's claim.

IV

The defendant next claims that the court erred in excluding the testimony of three witnesses regarding the character, mental stability, prior violent and erratic behavior, and reputation for truthfulness of George Sams. Sams was an accomplice in the Alex Rackley murder who testified as a state's witness against the defendant at trial after having pleaded guilty to second degree murder prior to trial. The defendant claims alternatively that the

evidence had relevance either on the question of Sams' credibility or on the defense of his own state of mind based on the alleged duress caused by Sams. The testimony proffered by the defendant's witnesses concerned how others perceived Sams, with no attempt to show that the defendant personally was aware of Sams' alleged reputation and prior acts of violence at the time the defendant himself was participating in the murder conspiracy culminating in the death of Rackley. Thus, such testimony would have been irrelevant to the issue of the defendant's own alleged fear of Sams. The defendant testified at trial that he only knew "a little" about Sams, which was that Sams had been expelled from the Black Panther Party because of a stabbing incident. The defense was in fact allowed to present testimony regarding Sams' erratic behavior, his reputation for mental instability, his violence and his reputation for veracity. In addition, a psychiatrist appointed to determine Sams' competency to testify was used as a defense witness on the question of Sams' mental stability and propensity for violence during the events leading up to Rackley's murder. The court did not err in excluding the testimony of the other witnesses concerning their knowledge of Sams' reputation for mental instability and violent behavior and his previous acts of violence. The trial court has broad discretion in determining the relevancy of evidence. *State* v. *Mullings,* 166 Conn. 268, 279, 348 A.2d 645; *State* v. *Lombardo,* 163 Conn. 241, 243, 304 A.2d 36; *Johnson* v. *Newell,* 160 Conn. 269, 277, 278 A.2d 776. There was no abuse of this discretion on the facts presented here. It was error for the court to refuse to permit the three witnesses to testify to Sams' reputation for veracity. See *Creer* v.

*Active Auto Exchange, Inc.*, 99 Conn. 266, 278, 121 A. 888; Holden & Daly, Connecticut Evidence § 125 b (3); McCormick, Evidence (2d Ed.) § 44. The court realized its error and attempted to cure it by admitting the testimony of a fourth witness as to Sams' reputation for truthfulness in the community, and the witness testified that Sams had no reputation for truthfulness and had a reputation for being a "crazy liar." Sams himself testified that he was sometimes called "Crazy George" or "Madman George." "In order to constitute reversible error . . . the rulings must have been both wrong and harmful." *State* v. *Tropiano,* 158 Conn. 412, 427, 262 A.2d 147, cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288. Under the circumstances, the error in excluding the testimony of the other three witnesses was harmless.

## V

Prior to trial the defendant moved to dismiss the indictment on the ground that the grand jury was unconstitutionally selected. Subsequently the defendant challenged the jury array and moved to dismiss the jury panel on the ground that it was unconstitutionally and unlawfully selected. Both motions were denied. The defendant, conceding in his brief that recent decisions of this court are controlling on both motions and will result in affirmance of the trial court's rulings, does not further brief those motions. See *State* v. *Brown,* 169 Conn. 692, 696, 364 A.2d 186 (jury array); *State* v. *Hart,* 169 Conn. 428, 433, 363 A.2d 80 (jury array); *State* v. *Townsend,* 167 Conn. 539, 545, 356 A.2d 125 (jury array); *State* v. *Cobbs,* 164 Conn. 402, 406–15, 324 A.2d 234 (grand jury), cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112. We agree that those

recent cases are sufficient authority to support the action of the court denying the defendant's motions challenging the selection of the grand jury and the jury array.

## VI

Finally the defendant assigns error in the denial of his motion to dismiss on the ground that the state's attorneys are appointed by the judges of the Superior Court and that such relationship results in a violation of the constitutional doctrine of separation of powers as well as in a denial of due process of law. In his brief, the defendant states that he does not brief this assignment of error in view of the court's holding in *State* v. *Moynahan*, 164 Conn. 560, 567, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219. There is no merit to the defendant's claim relating to the denial of his motion to dismiss because of the method of appointing state's attorneys. *State* v. *Moynahan*, supra.

There is no error.

In this opinion the other judges concurred.